IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| KARLEY E. NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 3:09-cv-700-MEF |
| | ) | |
| CHATTAHOOCHEE VALLEY | ) | (WO—Publish) |
| HOSPITAL SOCIETY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Karley E. Nelson ("Nelson"), a registered nurse, filed this lawsuit against

her former employer, Chattahoochee Valley Hospital Society (doing business as

Lanier Health Services) ("Lanier"), alleging pregnancy discrimination and

retaliation under the Pregnancy Discrimination Act ("PDA"), 42 U.S.C.

§ 2000e(k), and Title VII of the Civil Rights Act of 1964 ("Title VII"), *id.*

§§ 2000e-2(a) and 2000e-(3)(a); sex-based wage discrimination under the Equal

Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d); and the state-law tort of outrage.

This case is now before the Court on Lanier's Motion for Summary

Judgment (Doc. # 16), filed on May 13, 2010.  For the following reasons, the

motion will be DENIED on the retaliatory-discharge claim (Count 3[b]) and the

1

EPA wage-discrimination claim (Count 4); and GRANTED in all other respects (Counts 1, 2, 3[b] & 5).[1]

## II.  LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the summary-judgment record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The moving party can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present any evidence in support of an element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

---

[1] Also, Lanier moves to strike all or part of several of the affidavits that Nelson has proffered in opposition to the motion for summary judgment.  (*See* Doc. # 33, filed June 22, 2010.)  The Court finds that it would reach the same decision on the motion for summary judgment regardless of whether the challenged affidavits are struck from the record.  Therefore, the motion to strike will be DENIED AS MOOT.

Once the moving party has met its initial burden, Rule 56(e) "requires the nonmoving party to go beyond its pleadings and by its own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court must believe the evidence of the nonmoving party and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, the court must grant summary judgment. *See* Fed. R. Civ. P. 56(c).

## III.  RELEVANT FACTS

### A.    Facts Regarding Nelson's Demotion

Lanier is a small hospital in Valley, Alabama.  In May 2002, Nelson became employed as a registered nurse in Lanier's emergency room.  According to the employee handbook she received at the time she was hired, her employment was "at will."  About eighteen months later, Nelson became a "charge nurse," i.e., she supervised other nurses in the emergency room during her shift.  In March 2005,

she had her first child.  During her pregnancy, Nelson's supervisors told her that she could adjust her work schedule to accommodate her medical needs.

In October 2007, Nelson applied for and was promoted to the position of Assistant Manager of Lanier's Medical/Surgical Department (the "Med/Surg Unit").  With more than fifty patient beds and around 100 employees, the Med/Surg Unit was the largest department at Lanier, and, unlike many of the hospital's other departments, it operated on nights and weekends.  It was the only department that had an assistant manager.

As Assistant Manager of the Med/Surg Unit, Nelson was paid $23.75 per hour.  In addition to her other job duties, Nelson was required to be on call for the entire hospital for one week out of every five.  This hospital-wide on-call duty rotated among the hospital's four nurse managers and Nelson.  When on call, Nelson was required to respond to last-minute staffing problems by going in to work a shift or by finding someone else to work.

Soon after her promotion, Nelson became pregnant with her second child.  Then, in January 2008, Nelson's direct supervisor, Lance Strength ("Strength"), who was the Nurse Manager of the Med/Surg Unit, left his position on temporary military leave.  Nelson took over Strength's job duties and, in effect, became

4

Interim Nurse Manager of the Med/Surg Unit.[2]  She did not receive a pay raise in January 2008 for this extra work.[3]

After Strength's departure, Eve Wallace ("Wallace"), Lanier's new Director of Nursing, changed the on-call system.  Under the new on-call system, Nelson and the three remaining nurse managers were required to be on call continuously, but only for their own departments.  Nelson worked longer hours after the shift to the new on-call system; Lanier's time records show that Nelson sometimes worked more than eighteen hours in a day.

At about the same time, Nelson began to experience medical difficulties related to her pregnancy, including high blood pressure, frequent vomiting, weight loss, proteinuria, fatigue, lower back pain, leg pain, and swelling in her extremities.  These symptoms got worse the more hours she worked per day.  She complained about her symptoms and work schedule to many of her supervisors and colleagues, including Wallace; Christie Traffenstadt ("Traffenstadt"), a fellow

---

[2] In her affidavit, Nelson explains: "Lanier did not hire anyone or promote anyone temporarily to replace Mr. Strength, so I had responsibility for the largest unit in the hospital by myself.  I performed those duties previously performed by Mr. Strength and myself."  (Doc. # 29, Ex. C ¶ 11.)

[3] In her response to the motion for summary judgment, Nelson asserts that Strength did not return to his old position as Nurse Manager of the Med/Surg Unit when he came back from military leave (which was several months after Nelson was fired), but that he accepted a different manager position in the Intensive Care Unit.  This fact, however, is not in the record.

nurse manager; Clara Pitts ("Pitts"), Lanier's Vice President of Human Resources; and Denise Crowe ("Crowe"), Lanier's Chief Nursing Officer (and Wallace's direct supervisor).  Notwithstanding, she did not ask to take leave, she did not ask her physician to inform Lanier that she needed to take leave, and her physician did not recommend that she take leave.

On March 7, 2008, Nelson sent an e-mail to Wallace and Kelley Bridges (a friend of Nelson's at work).  In the e-mail, Nelson complained about the new on-call system and the long hours she was working, and she criticized her supervisors for not being responsive to her concerns and needs.  She wrote that she was not physically able to meet her on-call hours requirements, but she did not mention her pregnancy or her medical difficulties.

Three days later, on March 10, Nelson was summoned to a meeting with Wallace and Pitts about the tone and content of the e-mail.  At the meeting Nelson reiterated her complaints.  She told Wallace and Pitts that she could do every aspect of her job except for the longer on-call hours.  She asked for a lighter work schedule; specifically, she proposed that the on-call duty for the Med/Surg Unit alternate between her and at least one other nurse manager for the duration of her

pregnancy, so that she would be on call only every second week.[4]  Wallace and Pitts advised Nelson that the shift to the new on-call system was permanent and that they were not going to change it back to a rotating system.  They explained to her that if she could not meet her on-call hours responsibilities, then she could not do her job.

At the same meeting, Nelson also complained that she had never been given an official job description for her position.  Wallace and Pitts promised to get back to Nelson later that day.  That afternoon, they had a follow-up meeting.  Wallace and Pitts gave Nelson a copy of the official job description for the position of "Assistant Manager, Medical/Surgical Department."  They asked her to read the job description and determine whether she could fulfill the job duties of the position, particularly the hours requirements.[5]  Nelson again proposed to split her on-call duties with another nurse manager, specifically with Traffenstadt.  Wallace told Nelson that she would discuss Nelson's proposal with Traffenstadt and Crowe.  According to Nelson, Wallace also said that Nelson should start thinking about which of the other jobs at the hospital she might be willing and able to

---

[4] It can be inferred from the record that Nelson made this request several times before this meeting as well.

[5] It is not clear from the record if and how Nelson responded.  Certainly, there is no evidence that Nelson expressed an opinion of her job capabilities that was different from the one she had expressed earlier that morning.

perform.

Wallace then announced to Nelson that she would receive an $2.00-per-hour pay raise for her work as Interim Nurse Manager, which would be applied retroactively to the first day she performed those duties.[6]   It is uncontested that this $2.00 differential was the normal pay raise for employees serving as interim managers.   Thus, in total, Nelson earned $25.75 per hour as Interim Nurse Manager.   By comparison, Strength earned $32.96 per hour as Nurse Manager, or about 30% more than Nelson.

Two days later, on March 12, Wallace and Pitts had another meeting with Nelson.   They explained to Nelson that her proposal to modify her on-call schedule was not in the best interests of the hospital, and they again asked her if she could fulfill all of the job duties of her position.   According to Nelson's own deposition testimony, she told Wallace and Pitts that she could satisfy all the requirements of her position except for her on-call duties.   She stated that she could not satisfy her on-call duties because of her pregnancy.

That afternoon, Wallace and Pitts informed Nelson that because she could not perform all of her job duties, she would be reassigned to a nonmanagement

---

[6] Nelson had complained about doing extra work without extra pay before this meeting, but the record does not indicate when she made her complaint.

position.  They offered her several available nonmanagement positions (all of

which involved a pay cut and a loss of rank).  Nelson asked to be reassigned to a

"float pool" nurse position.  A few days after Nelson's demotion, Traffenstadt

became the new nurse manager of the Med/Surg Unit.

The next day, on March 13, Nelson wrote a letter to Wallace and Pitts

challenging her demotion.  In the letter, Nelson wrote, in pertinent part:

> I do not wish to vacate my position as assistant manager of the
> medical surgical units here at Lanier as I was mandated to do
> yesterday.  I am able to perform every expectation placed on me
> except for the twenty-four hour a day, seven day a week call.  It was
> explained to me in the meeting in Clara's office yesterday that I do a
> good job and have met all of my expectations in my current role, even
> with the newly added responsibilities.  I have a temporary medical
> condition (pregnancy) that makes it difficult for me to work the
> twenty-hour shifts that I have been working weekly.  I proposed an
> alternative call schedule that would allow me to stay in my position as
> assistant manager. . . .
>
> *I feel as though I am being punished or discriminated against*
> *because I am pregnant.*  My longevity with Lanier and [exemplary]
> attendance record and obvious effort while at work make me a
> valuable employee to Lanier.  I have seen "special circumstances"
> given to employees in the recent past and am only asking for the same
> consideration. . . .
>
> I would also like to point out that although my pregnancy has
> progressed, I am still able to perform my duties as they were
> originally explained to me.  The requirements on me have changed in
> the last few weeks and it is the new call requirements that [are] so
> physically demanding that they are [a]ffecting my health and possibly
> my pregnancy.  I wish to be reinstated into my assistant manager's

> position and allowed to take call every other week for the next eight
> weeks, at which time I will be go[i]ng out on maternity leave.  Please
> take my wishes into consideration.

(Doc. # 29, Ex. D (emphasis added).)  Nelson testified at her deposition that she

also expressed these sentiments at some of the earlier meetings.

Wallace responded to Nelson's letter by telling Nelson that her pregnancy

had not been an issue in her demotion, but that she had been demoted because she

could not fulfill the required on-call hours of her position because of her stated

inability to make adequate child-care arrangements.[7]  Nevertheless, as Nelson had

requested in her letter, Wallace and Pitts reviewed the matter again.  On March 17,

Wallace sent a letter to Nelson that stated that Nelson had been demoted from her

position because she either could not or would not work the required on-call hours

of her position because of "child care issues," not her pregnancy.

Nelson testified at her deposition that at some point during either the March

10 and March 12 meetings or the later conversation with Wallace about the March

13 letter, Wallace also told Nelson that because Nelson could not fulfill all of her

job duties, she could either take leave or be demoted.

Nelson was disciplined on several occasions while she was Assistant

---

[7] Lanier has consistently argued that Nelson stated at the March 10 and March 12
meetings that she was not able to work the required on-call hours of her position because she was
having trouble finding adequate child care.

Manager or Interim Nurse Manager of the Med/Surg Unit.  Only two of these disciplinary actions relate to her ability to meet her on-call duties: (1) a "counseling" regarding an incident in February 2008 where Nelson had been late in responding to a call (although Nelson testified at her deposition that this incident was before the on-call system had changed and that she was not on call that week); and (2) a "counseling" issued on March 10, 2008 (the same day as Nelson's first formal meeting with Wallace and Pitts) regarding two incidents on March 8 and March 9 where Nelson had failed to respond to calls.[8]

## B.     Facts Regarding Nelson's Discharge

Two months after the demotion, on May 21, 2008, the family of an elderly, low-weight patient who was recuperating from hip-replacement surgery visited the nurses' station to request that the patient be given medication to calm her nerves. Nelson went to the patient's room.  What happened next is in dispute, and the Court must view the facts in the light most favorable to Nelson.  According to Nelson, the family instructed her not to give morphine to the patient.  So, in front of the family, Nelson gave the patient an intramuscular injection of Demerol and

---

[8] But because Lanier's articulated legitimate, nondiscriminatory reason for the demotion is that Nelson told Wallace and Pitts that she was unable to meet her on-call responsibilities, and not that she actually failed to fulfill those responsibilities, these disciplinary actions are not relevant to the motion for summary judgment.

Phenergan.  Demerol is a pain medication, and Phenergan is a medication that controls the nausea often caused by Demerol.  The patient had been prescribed both drugs, but only through an intramuscular injection.  Nelson noted on the patient's medical chart that she had given the patient an intramuscular injection of Demerol and Phenergan.

A little while later, the patient had an adverse reaction to the medications. The family came to the nurses' station again to inform Nelson about the patient's reaction.  When Nelson arrived, she noticed that the patient was lethargic and in respiratory distress, and she called for assistance.  While taking the patient's vital signs, Nelson mimicked the patient's heavy breathing and joked, "She does kind of sound like Darth Vader, doesn't she?"  (Doc. # 17, Ex. A, Nelson Dep. 156:16–17.)  According to Nelson, the family laughed at her joke and agreed with her that the patient sounded like Darth Vader.  Several family members also mimicked the patient's heavy breathing.  The patient recovered from her distress after she was given another drug to reverse the effects of the Demerol.

Several days later, the patient's family lodged a complaint against Nelson. The family's version of events was different from Nelson's version.  The family claimed that: (1) Nelson contravened their explicit instruction that the patient was not to be given *any* pain medications (not just morphine); (2) Nelson lied to them

12

by telling them that she was going to give the patient "liquid Xanax" (i.e., Ativan) instead of a pain medication; (3) Nelson gave the injection *intravenously*, not intramuscularly as had been prescribed; (4) Nelson's intravenous injection caused the patient's distress, since an intravenous injection of Demerol directly into the blood stream of elderly, low-weight patients often leads to the type of adverse reaction the patient experienced; and (5) Nelson falsified the patient's medical chart by noting that she had given the patient an intramuscular, as opposed to an intravenous, injection.  In addition, the family complained about Nelson's Darth Vader joke, which they thought was offensive and rude, and they alleged that Nelson had neglected the patient by visiting the patient's room only twice during the twelve-hour shift.

Traffenstadt investigated the family's complaint and found that, according to the hospital's medical-dispense report, Nelson had taken only Demerol and Phenergan from the dispensary.  In addition, she viewed security footage that showed that Nelson had visited the patient's room six times in a four-hour period, not twice in twelve hours as the family had alleged.  Other than Nelson's notations on the patient's medical chart, Traffenstadt did not find any other evidence that either supported or discredited the family's allegations.

On May 27, 2008, Nelson was ordered to a meeting with her supervisors

(Wallace, Pitts, and Traffenstadt) about the family's complaint.  When Nelson arrived at the meeting, she noticed that her termination papers had already been filled out.  The supervisors asked what had happened with the patient.  Nelson testified at her deposition that, at first, she could not remember which patient they were referring to.  She told her supervisors that because she could not remember the incident very well, she would have to rely on what she had noted on the patient's medical chart at the time.  She did, however, admit to making the Darth Vader joke, but she explained that she had not intended to make fun of the patient and that the family had treated it like the light-hearted joke she had intended it to be.

Also, Nelson informed her supervisors that she had had a bad relationship with two of the patient's family members before the incident.  One of these two family members was the patient's granddaughter, who had once been a friend of Nelson's at school but had since become estranged and, at the time of the incident, was dating Nelson's ex-husband.  The other, the granddaughter's mother, was a beautician who had cut Nelson's hair on several occasions and had recently become upset when Nelson had failed to greet her when they saw each other in the hallway at the hospital.  Neither of these two family members had been in the patient's room at the time of the incident.

After hearing Nelson's side of the story, her supervisors told Nelson that she had committed several standard-of-conduct violations for which the Lanier employee handbook permits "discharge without prior warning": (1) "Abusive, rude, or inappropriate treatment of or behavior towards a patient"; (2) "Action, inaction, behavior, or violation of Lanier policy which creates a major liability risk for Lanier"; and (3) "Falsification of any Lanier record or document."  (Doc. # 29, Ex. K at 18.)  They then gave Nelson the choice of either resigning from her job or being fired.  Nelson resigned.  The record does not indicate who replaced Nelson in her "float pool" position.

Nelson had her second child in June 2008.  On July 9, 2008, Nelson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  On May 4, 2009, the EEOC issued a Notice of Right to Sue without making a determination on the merits of Nelson's charge, and Nelson filed this lawsuit on July 27, 2009.

## IV.  DISCUSSION

Nelson alleges pregnancy discrimination, retaliation, sex-based wage discrimination, and outrage.  Lanier now moves for summary judgment on all of Nelson's claims.

## A.      Pregnancy-Discrimination Claims (Counts 1 & 2)

The PDA provides that the prohibition against sex-based employment discrimination in Title VII, 42 U.S.C. § 2000e-2(a)(1), applies with equal force to discrimination on the basis of "pregnancy, childbirth, or related medical conditions." *Id.* § 2000e(k).  Further, the PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.*

The analysis required for a pregnancy-discrimination claim is the same type of analysis used in other Title VII sex-discrimination suits. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312–13 (11th Cir. 1994).  Therefore, the Court will apply the burden-shifting framework set forth by the U.S. Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[9]

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima-facie case of discrimination. *McDonnell Douglas*, 411 U.S.

---

[9] The *McDonnell Douglas*–*Burdine* burden-shifting framework is used to evaluate Title VII disparate-treatment claims that are based on circumstantial evidence.  Generally, a plaintiff may establish disparate treatment through direct or circumstantial evidence.  In this case, Nelson has not pointed to any direct evidence of discrimination, and the Court cannot locate any direct evidence of discrimination in the record.

at 802; *Burdine*, 450 U.S. at 252–53.  Once the plaintiff creates an inference of

discrimination by establishing a prima-facie case, the burden shifts to the

employer to articulate a "legitimate, nondiscriminatory reason" for its actions.

*Burdine*, 450 U.S. at 255.  If the employer articulates such a reason, then the

burden shifts back to the plaintiff, who may avoid summary judgment by

producing "sufficient evidence for a reasonable factfinder to conclude that each of

the employer's proffered nondiscriminatory reasons is pretextual."  *Chapman v. AI

Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

Nelson brings two pregnancy-discrimination claims under the PDA.  First,

she claims that Lanier demoted her from her manager position because of her

pregnancy.  Second, she claims that Lanier fired her because of her pregnancy.

The Court will address each claim in turn.

1.   Nelson's Demotion Claim (Count 1)

"More than one formulation of the elements of a prima facie case exist.  The

Court in *McDonnell Douglas* recognized this when it . . . stated that '[t]he facts

necessarily will vary in Title VII cases, and the specification . . . of the prima facie

proof required . . . is not necessarily applicable in every respect to differing factual

situations.'"  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008)

(quoting *McDonnell Douglas*, 411 U.S. at 802 n.13); *see also Wilson*, 376 F.3d at

17

1087 ("The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation.").

The parties urge this Court to apply a formulation of the prima-facie case in which Nelson must prove: (1) she was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she suffered from a differential application of work or disciplinary rules. *Armstrong*, 33 F.3d at 1314. Lanier does not dispute that Nelson has satisfied the first three elements. Rather, Lanier argues that Nelson "cannot show that she suffered from a differential application of work or disciplinary rules, as she has not identified a non-pregnant management employee who could not fulfill the duties of his or her position but was not demoted . . . ." (Doc. # 17 at 26.)

This Court agrees that Nelson has failed to identify an appropriate comparator to show that she suffered from a differential application of work or disciplinary rules. That is not to say that Nelson has identified *no* potential comparators; in fact, she has identified a number of pregnant employees at Lanier who were allowed to work fewer hours than usual during their pregnancies— Jennifer Wharton Williams, Leslie Carmichael, Even Wallace, and Nelson herself (during her first pregnancy).

But pregnant employees are not acceptable comparators in disparate-

18

treatment suits alleging pregnancy discrimination.  This is because the PDA does not required an employer to provide special accommodations to its pregnant employees; instead, the PDA only ensures that pregnant employees are given the same opportunities and benefits as *nonpregnant* employees who are similarly limited in their ability to work.  *See Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999) ("The PDA does not require that employers give preferential treatment to pregnant employees."); *Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1382 (11th Cir. 1994) ("It is today settled precedent that the PDA and Title VII are violated when pregnant employees are denied privileges afforded nonpregnant temporarily disabled employees.").  And if an employee's pregnancy prevents her from fulfilling the duties of her position, her employer is not obligated to treat her any differently than it would treat a nonpregnant employee who is in the same position.  *See Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000) ("[T]he Pregnancy Discrimination Act . . . is not violated by an employer who fires an employee for excessive absences, unless the employer overlooks the comparable absences of non-pregnant employees."); *see also Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) ("[T]he Pregnancy Discrimination Act does not require that employers make accommodations for their pregnant workers; 'employers can treat pregnant women as badly as they treat similarly affected but

19

nonpregnant employees.'" (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994)) (alterations omitted)).

Therefore, Nelson must do more than simply identify a pregnant employee who has been either given a benefit or spared a burden because of her pregnancy. She must identify a *nonpregnant* employee who was similarly limited in his or her ability to work and was treated more favorably than Nelson was. Nelson has identified only one nonpregnant employee as a potential comparator—LaShonda Moore, a nurse at Lanier who was permitted to take leave in order to attend school. But Moore is not an appropriate comparator for several other reasons: (1) Moore did not serve in a management position like Nelson; (2) unlike Nelson, Moore was able to perform all of her job duties; and (3) Moore was not treated more favorably than Nelson, because both employees were offered the option of taking leave—Moore took leave and kept her job; Nelson didn't and lost hers. In other words, Moore and Nelson are not a similarly situated. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) ("The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.'" (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). Having no other evidence that she suffered from a differential application of work or disciplinary rules, Nelson has failed to establish a prima-facie case under the

*Armstrong* formulation.

But this is not the end of the Court's inquiry. A court must not be straitjacketed by a particular formulation of the prima-facie case; its ultimate aim must be to determine whether the plaintiff has proffered sufficient evidence to create an inference of discrimination, and while comparator evidence may be the best method by which to do so, the plaintiff may rely on other circumstantial evidence instead. *See Holifield*, 115 F.3d at 1562 ("Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." (citations omitted)); *Rioux*, 520 F.3d at 1277 (holding that comparator evidence is not required in a demotion case where there is other evidence that creates an inference of discrimination); *Hunter v. Mobis Alabama, LLC*, 559 F. Supp. 2d 1247, 1257 (M.D. Ala. 2007) (Albritton, J.) (holding that the lack of a similarly situated comparator should not defeat the plaintiff's prima-facie case of pregnancy discrimination when there is otherwise sufficient circumstantial evidence of discriminatory intent).

In certain demotion cases (especially in those cases in which the employer has not tried to justify its demotion of the plaintiff by pointing to the plaintiff's violation of work or disciplinary rules, as in this case), the Eleventh Circuit has applied a formulation of the prima-facie case with a different fourth element.

21

Under this formulation, the plaintiff need only prove that she was replaced in her old position by someone from outside of her protected class. *See Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000); *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994) (applying this different fourth element).

In this case, Nelson was replaced as Interim Nurse Manager of the Med/Surg Unit by Traffenstadt, a nonpregnant employee. Therefore, under this alternative formulation, Nelson has raised an inference of discrimination and thereby established a prima-facie case of pregnancy discrimination with resort to comparator evidence.

Since Nelson has raised an inference of discrimination, the burden shifts to Lanier to articulate a "legitimate, nondiscriminatory reason" for its decision to demote Nelson. *Burdine*, 450 U.S. at 255. Lanier argues that it reassigned Nelson to a nonmanagement position because she "could not fulfill the duties of her position as a manager." (Doc. # 17 at 27.) This is a suitable nondiscriminatory reason; therefore, the inference of discrimination is extinguished, and the burden shifts to Nelson to produce "sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037.

22

To show pretext, Nelson must demonstrate "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted). If "the proffered reason is one that might motivate a reasonable employer, the employee must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030.

First, Nelson argues that Lanier forced her to choose between taking leave and losing her manager position, and that forcing an employee to make such a choice is inherently discriminatory. The Court disagrees. The ability to take leave without any detrimental effect on one's employment is a benefit, not a burden. There is nothing inherently discriminatory about it; in fact, it shows favorable, not unfavorable, treatment towards the employee being offered leave. And because Nelson has not shown that Lanier offered any other similarly situated employees a greater benefit than the option to take leave, her argument shows neither discriminatory intent nor pretext.

Second, Nelson contends that Lanier's failure to assign or promote another nurse to help Nelson manage the Med/Surg Unit shows discriminatory intent. The implication appears to be that Lanier treated Nelson's male predecessor, Strength,

more favorably than it treated Nelson because Strength had an assistant manager to share the load, while Nelson did not have the same benefit. But Nelson has presented no evidence to support her contention that Lanier's decision not to appoint a second manager for the Med/Surg Unit (and to require Nelson to manage the department on her own until Strength's return) was anything other than a legitimate, nondiscriminatory business decision. The onus is on Nelson to present sufficient evidence to the contrary, and she has not done so.

Third, Nelson argues that the change to the new on-call system had a disproportionate adverse impact on her since she was the only pregnant nurse manager. Indeed, the new on-call system may have placed a greater burden on Nelson than on the other nurse managers, but Nelson's complaint does not contain a disparate-impact claim. Moreover, a disparate impact does not, in and of itself, tend to prove that Lanier either had discriminatory intent or that its legitimate, nondiscriminatory reason for demoting Nelson was pretextual.

Fourth, Nelson asserts that Lanier's reason for the demotion is pretextual because she never actually failed to perform her job. It is true that as far as the record on summary judgment is concerned, Nelson did not actually fail to perform any part of her job. This would, no doubt, show pretext if Lanier's reason for the demotion was that Nelson had actually failed to do her job. But it wasn't.

24

Lanier's reason for the demotion was that Nelson unequivocally and repeatedly told her supervisors that she could not meet the required on-call hours of her position. Thus, Nelson's actual track record at work is simply not relevant.

Fifth, and related to the previous argument, Nelson contends that Lanier's reason for the demotion is pretextual because Lanier has argued that Nelson said she could not fulfill her job duties because of "child-care issues," while the record when viewed in the light most favorable to Nelson shows that Nelson  told her supervisors that the reason she could not fulfill her job duties was because of her pregnancy. But Nelson was demoted because of her express statements; her reasons for making those statements are not germane. Whether Nelson concluded that she could not do her job because of her pregnancy or because of her inability to make child-care arrangements does not change the fact that Nelson concluded and then communicated to her supervisors that she could not do her job. Further, Lanier has consistently argued that Nelson told her supervisors that her inability to make adequate child-care arrangements was the reason she could not meet her on-call hours requirements. In other words, Lanier has not changed its story, and thus there is no evidence of inconsistent statements with which to impeach Lanier's legitimate, nondiscriminatory reason.

With no other evidence of discriminatory intent or pretext, Nelson has failed

to produce "sufficient evidence for a reasonable factfinder to conclude that

[Lanier's] proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d

at 1037.  Therefore, the Court will grant the motion for summary judgment on

Nelson's demotion claim.

2.     Nelson's Disciplinary-Discharge Claim (Count 2)

Because Lanier asserts that it fired Nelson because she violated workplace

rules, the Court will apply the *Armstrong* formulation: in order to establish a

prima-facie case, Nelson must prove: (1) she was a member of a protected class;

(2) she was qualified for the job; (3) she suffered an adverse employment action;

and (4) she suffered from a differential application of work or disciplinary rules.

*Armstrong*, 33 F.3d at 1314.  Again, Lanier does not dispute that Nelson has

satisfied the first three elements, but argues that Nelson has not shown that she

suffered from a differential application of work or disciplinary rules.

"When a plaintiff alleges discriminatory discipline, [the court must]

evaluate 'whether the employees are involved in or accused of the same or similar

conduct and are disciplined in different ways.'" *Burke-Fowler v. Orange County,*

*Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia v. Brown*, 171 F.3d

1364, 1368 (11th Cir. 1999)).  When making that determination, the court must

follow the Eleventh Circuit's requirement that "the quantity and quality of the

26

comparator's misconduct be nearly identical to prevent courts from second-guessing employer' reasonable decisions and confusing apples with oranges." *Id.* (quoting *Maniccia*, 171 F.3d at 1368).

Nelson has identified only one Lanier employee whom she believes was accused of similar misconduct but received less severe punishment—Eve Wallace. According to the evidence Nelson has entered into the record, Wallace was disciplined a number of times during her career at Lanier. Specifically, Nelson points to incidents where Wallace made unkind comments about the weight of an applicant for a manager position, made rude or abusive comments to her colleagues, permitted employees to bring their children to the hospital during their shifts in violation of hospital rules, failed to train staff she was supervising, and called Crowe "the meanest person I know."

Wallace's misconduct is easily distinguishable from Nelson's alleged misconduct. Nelson was not accused of mistreating her colleagues, but of mistreating a patient and her family, possibly to the point of risking the patient's life. This is meaningfully different from all of Wallace's infractions, which were not directed towards patients and did not carry a substantial risk of injury or death. "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v. WLCY*

*Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).  Here, Lanier was entitled to conclude that calling someone mean or fat is just not the same as mistreating a patient and her family.

Nelson has presented no other evidence of discriminatory intent.  Therefore, Nelson has failed to establish a prima-facie case, and the Court will grant the motion for summary judgment on her discriminatory-discharge claim.

## B.     Retaliation Claims (Count 3)

Title VII's anti-retaliation provision makes it unlawful for an employer to retaliate against an employee because the employee has opposed an unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).  To establish a prima-facie case of retaliation, a plaintiff must show: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  If the employer then articulates a legitimate, nonretaliatory reason for its actions, the plaintiff must show that the "proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct."  *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999)).  To show pretext, the plaintiff must show "such

28

weaknesses implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quotation omitted).

Nelson contends that Lanier demoted and fired her in retaliation for her request for a reasonable accommodation of her work schedule at the March 10 and March 12 meetings with Wallace and Pitts. Lanier challenges only the first and third elements of Nelson's prima-facie case.

To satisfy the first element—the "statutorily protected activity" prong—a plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). Even though Nelson was not entitled to a reasonable accommodation of her work schedule as a matter of law, the content of her March 13 letter to Wallace and Pitts (in which she alleged that she had been a victim of pregnancy discrimination) is sufficient evidence to support an inference that she had a good-faith belief at the March 10 and 12 meetings that she was entitled to a reasonable accommodation of her work schedule. Further, this mistake is not objectively unreasonable; Nelson is a not a lawyer, and thus cannot be expected to know what the law requires or does not require, and she knew when she made her request for a reasonable accommodation that Lanier had

accommodated her first pregnancy and the pregnancies of several other employees, including Jennifer Wharton Williams and Leslie Carmichael. Accordingly, Nelson has satisfied the first prong of her prima-facie case of retaliation.

To satisfy the third element—the "causal connection" prong—a plaintiff merely has to prove that "the protected activity and the adverse action are not completely unrelated." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008). This burden can be met "by showing close temporal proximity between the statutorily protected activity and the adverse employment action," *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The temporal proximity must be "very close" is there is no other evidence tending to show causation. *Id.*; *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("In the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.").

In this case, Lanier demoted Nelson on March 12, 2008, and fired her on May 27, 2008. Both of these adverse employment actions took place within two-and-a-half months of Nelson's request for a reasonable accommodation of her work schedule at the March 10 and March 12 meetings with Wallace and Pitts.

30

Consequently, Nelson has proved a sufficiently close temporal proximity and thereby has satisfied the third prong of her prima-facie case of retaliation.

Therefore, Nelson has established a prima-facie case of retaliation, and the burden shifts to Lanier to articulate legitimate, nonretaliatory reasons for the demotion and the discharge. *McCann*, 526 F.3d at 1375.  Lanier argues that it demoted Nelson because Nelson stated that she could not fulfill the duties of her position as nurse manager, and it contends that it fired Nelson because she violated several employee standards of conduct by mistreating a patient and that patient's family.  Both of these reasons are suitable nonretaliatory reasons, and so the burden shifts back to Nelson to show that these reasons are pretextual. *Id.*

Regarding the demotion, the evidence of pretext that Nelson has produced with respect to her retaliatory-demotion claim is the same unpersuasive evidence of pretext that she produced with respect to her discriminatory-demotion claim under the PDA.  Thus, Nelson has failed to show that Lanier's proffered reason is pretextual, and the Court will grant the motion for summary judgment on Nelson's retaliatory-demotion claim.

Regarding the discharge, however, Nelson has presented evidence tending to show that Lanier did not honestly believe that Nelson had committed the standard-of-conduct violations for which she was fired.  Nelson testified at her

deposition that her termination papers had already been filled out by the start of the March 27 meeting about the patient's family's complaint, which tends to show that Nelson's supervisors had already decided to fire her before giving her an opportunity to tell her side of the story.  This was before Nelson admitted to her supervisors that she had made the Darth Vader joke (which is the only act alleged by the patient's family that she has admitted to committing), but after Traffenstadt had completed her investigation, which had revealed that there were significant reasons to doubt the family's truthfulness.

Viewing these facts in the light most favorable to Nelson, the Court has no trouble believing that a reasonable jury could find that Lanier's proffered reason for firing Nelson was not its real reason.  Therefore, Nelson has created a genuine issue of material fact as to whether Lanier's proffered reason for the discharge was pretextual, and the Court will deny the motion for summary judgment on Nelson's retaliatory-discharge claim.

## C.    Equal Pay Act Claim (Count 4)

The EPA prohibits sex-based wage discrimination.  *See* 29 U.S.C. § 206(d)(1).  To prevail on a claim under the EPA, an employee must first establish a prima-facie case "by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require equal skill,

effort, and responsibility, and which are performed under similar working

conditions." *Stegner v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003)

(citing 29 U.S.C. § 206(d)(1) and *Corning Glass Works v. Brennan*, 417 U.S. 188,

195 (1974) (quotation omitted).

Once the employee presents a prima-facie case, the employer may avoid

liability by proving by a preponderance of the evidence that the pay differential is

based on: "(i) a seniority system; (ii) a merit system; (iii) a system which measures

earnings by quantity or quality of production; or (iv) . . . any other factor other

than sex." *Id.* at 1078 (quoting 29 U.S.C. § 206(d)(1)).  "The burden to prove

these affirmative defenses is heavy": the employer must show that "'the factor of

sex provided *no basis* for the wage differential.'"  *Id.* (quoting *Irby v. Bittick*, 44

F.3d 949, 954 (11th Cir. 1995)).  If the employer overcomes this heavy burden,

"the employee 'must rebut the [employer's] explanation by showing with

affirmative evidence that it is pretextual or offered as a post-event justification for

a gender-based differential.'"  *Id.* (quoting *Irby*, 44 F.3d at 954).

Nelson claims that Lanier violated the EPA by paying Strength (when he

was Nurse Manager) about 30% more than it paid Nelson (when she was Interim

Nurse Manager) for substantially equal work.  Lanier does not dispute that Nelson

has established a prima-facie case under the EPA; rather, Lanier relies on the

EPA's catch-all, "any other factor other than sex" affirmative defense.  29 U.S.C. § 206(d)(1)(iv).  Specifically, Lanier points to two factors other than sex to justify the pay differential between Nelson and Strength.

First, Lanier argues that Nelson's service as Interim Nurse Manager of the Med/Surg Unit was temporary and that the EPA does not require employers to equalize the pay of permanent and temporary employees, even if both types of employees are tasked with substantially equal work.  The regulations promulgated by the EEOC pursuant to the EPA supports this argument; they provide that an employer does not violate the EPA by temporarily reassigning a employee to a higher-paying position without increasing the employee's pay:

> [A]n employee may be required, during the period of temporary reassignment, to perform work for which employees of the opposite sex are paid a higher wage rate than that paid for the duties of the employee's regular job classification.  In such a situation, the employer may continued to pay the reassigned employee at the lower rate, if the rate is not based on quality or quantity of production, and if the reassignment is in fact a temporary one.

29 C.F.R. § 1620.26(b).  Although the EEOC's views do not control this Court, they nonetheless "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Gen. Elec. Co. v. Gilbert*, 428 U.S. 125, 141–42 (1976) (quotation omitted).  This Court agrees with the EEOC that the temporary nature of a position is a factor "other than sex" sufficient

34

to justify an otherwise illegal pay disparity, provided that the position was temporary in fact and that the employee in that position knew it was temporary.

In this case, there is a genuine issue of material fact on both of those caveats. First, this Court cannot rely on Strength's and Nelson's respective job titles to show that Strength's job was permanent and Nelson's job was temporary. The EPA requires courts to compare the substance, not the form, of employees' jobs. Thus, the fact that Nelson's job title was "Interim Nurse Manager" is not dispositive. Second, although the record reveals that Nelson clearly understood that Strength's military leave was temporary, it does not show that Nelson knew that her position was temporary. There is no evidence to stop this Court from believing that Nelson thought that her interim status was merely a transition period before her appointment as permanent Nurse Manager of the Med/Surg Unit. Third, Nelson's tenure as Interim Nurse Manager lasted for more than one month, and there is no evidence that her service was for a set term with a certain end date. The EEOC regulations clearly state that "failure to pay the higher rate to an employee reassigned for a period longer than one month will raise questions as to whether the reassignment was in fact intended to be temporary." *Id.* Therefore, based on the record before it, Lanier has not satisfied its heavy burden to prove by a preponderance of the evidence that Nelson's service as Interim Nurse Manager

35

was temporary in fact or that she knew it was temporary.

Lanier's second argument is that Strength was paid more than Nelson because he was more senior and more experienced as a manager when he served as Nurse Manager than Nelson was when she served as Interim Nurse Manager. Here again, Lanier has not proffered sufficient evidence to prove this affirmative defense by a preponderance of the evidence.  There is some evidence in the record that Strength had been an employee longer than Nelson and that he had served in a management position for several months longer than Nelson.  But Strength's employee file is not in evidence, and there is no other evidence that shows how each additional year of employment or additional month of management service would affect an employee's salary.  In other words, while there is sufficient evidence in the record to show that Strength reasonably should have been paid more than Nelson, there is not sufficient evidence to show why Strength was paid 30% more than Nelson and not 10% or 50% or 100% more.

The burden is on Lanier under the EPA is to prove a statutory affirmative defense by a preponderance of the evidence; it must do more than just state a legitimate, nondiscriminatory reason for the pay differential.  Because Lanier has failed to produce enough evidence, the Court will deny the motion for summary judgment on Nelson's EPA claim.

**D.     Outrage Claim (Count 5)**

In Alabama, to prevail on a claim of outrage, a plaintiff must prove that the defendant's conduct: "(1) was intentional and reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993). Conduct is only actionable, however, if it is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981). As a result, outrage "is a very limited cause of action that is available only in the most egregious of circumstances." *Thomas*, 624 So. 2d at 1044. Indeed, it is so limited that the Alabama Supreme Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment. *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).

In her response to the motion for summary judgment, Nelson argues that the facts of this case fall into the third category of "egregious sexual harassment." Specifically, she argues that Lanier's alleged conduct constitutes "tangible action sexual harassment" that is extreme and outrageous. Her argument is unavailing.

37

The facts of this case have none of the telltale signs of the type of egregious sexual conduct that Alabama courts have thus far recognized as sufficiently extreme and outrageous to survive summary judgment.  Nelson has presented no evidence that Lanier subjected her to violent or disturbing sexual acts, indecent or lewd comments, unwanted touching or groping, or even sexual jokes or innuendo.  *See Thornton v. Flavor House Prods., Inc.*, No. 1:07-cv-712, 2008 WL 5328492 (M.D. Ala. Dec. 19, 2008) (Waktins, J.) (describing the facts of the principal cases in which the Alabama Supreme Court has found sexual harassment to be so egregious as to qualify for the tort of outrage).  At most, Lanier unlawfully demoted and fired Nelson because of her pregnancy several weeks before her baby was due.  To say that that kind of conduct is egregious sexual harassment would be to expand the law well beyond its current bounds.

Therefore, the Court finds that, as matter of law, Lanier's alleged conduct is not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency," *Inmon*, 394 So. 2d at 365, and the Court will grant the motion for summary judgment on Nelson's outrage claim.

## V.  CONCLUSION

Accordingly, it is hereby ORDERED as follows:

1.    Lanier's Motion for Summary Judgment (Doc. # 16), filed on May

13, 2010, is GRANTED with respect to both pregnancy-discrimination claims (Counts 1 & 2), the retaliatory-demotion claim (Count 3[a]), and the outrage claim (Count 5); and DENIED with respect to the retaliatory-discharge claim (Count 3[b]) and the wage-discrimination claim (Counts 4).

2.    Lanier's Motion to Strike Affidavits of Plaintiff Karley E. Nelson, Dr. James A. Buford, Jr., Joni W. Fulghum and Lance Strength (Doc. # 33), filed on June 22, 2010, is DENIED AS MOOT.

DONE this the 4th day of August, 2010.


_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE